FILED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JUL 11 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Y _____
          DEPUTY CLERK

| | | |
|---|---|---|
| ARMANDO MARTINEZ, | § | |
| TDCJ No. 1040666, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL NO. SA-04-CA-1023-RF |
| | § | |
| NATHANIEL A. QUARTERMAN, | § | |
| Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Armando Martinez filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 seeking to collaterally attack his April, 2001, Bexar County conviction for capital murder and sentence of life imprisonment.  For the reasons set forth below, respondent's motion to dismiss petitioner's federal habeas corpus petition as untimely will be denied but petitioner's federal habeas corpus petition will be denied on the merits and petitioner denied a Certificate of Appealability.

### I. Background

A.   The Offense and its Aftermath

On the afternoon of January 17, 1999, Delilah Bustos Moczygemba left her 35-month-old son Anthony in the care of her

boyfriend, petitioner Armando Martinez, to run errands.[1]  There
is no dispute that petitioner was the only person with access to
Anthony that afternoon.[2]  Late that same afternoon, petitioner
and his sister Nereyda Martinez found Anthony having difficulty
breathing in the bedroom of the apartment petitioner shared with
his mother.[3]  Petitioner and his sister telephoned for

_____

[1] Anthony's mother testified without contradiction at
petitioner's trial that (1) Anthony's date of birth was February
15, 1996, (2) on January 17, 1999, she left Anthony, who was in
good health, in petitioner's care while she, her daughter, and
petitioner's mother and sister went to a flea market, (3) she
later returned to petitioner's mother's apartment and briefly
observed Anthony, who appeared to be fine, sleeping on a bed in
the bedroom, (4) she left again to take petitioner's mother and
sister to the grocery store, (5) on their way back to the
apartment, petitioner's brother stopped their vehicle and
informed them Anthony was being taking via ambulance to the
hospital, and (6) at the hospital, petitioner told her Anthony
had woken up, tried to vomit, and been unable to breathe.
Testimony of Delilah Bustos Ariola, Statement of facts from
petitioner's trial (henceforth "S.F. Trial"), testimony of
Delilah Bustos Ariola, Volume 5 of 12, at pp. 166-231; Volume 6
of 12, at pp. 5-66.

[2] Petitioner admitted during his trial testimony that no
other adult had access to Anthony on the afternoon in question.
S.F. Trial, Testimony of Armando Martinez, Volume 10 of 12, at
pp. 104 & 121.

[3] Petitioner testified that (1) Anthony's mother left him
with petitioner at the petitioner's mother's apartment in the
early afternoon on January 17, 1999, (2) shortly after they left,
petitioner fixed Anthony scrambled eggs, (3) Anthony then fell
asleep on the living room floor watching television, (4)
petitioner took a shower, leaving Anthony unattended for
approximately fifteen minutes, (5) when he exited the bathroom,
he found Anthony asleep on the living room floor and carried
Anthony to the bedroom, where he laid the child on a bed, (6) he
later heard a noise that sounded like something falling but did
not check it, (7) later still, he entered the bedroom, found
Anthony asleep on the floor, picked him up, and placed him back

assistance.[4]  Emergency medical technicians arrived minutes later
and found Anthony unconscious and in respiratory distress.[5]  They
transported Anthony to Brooke Army Medical Center ("BAMC"), where
Anthony was placed on a respirator and diagnosed as comatose and
neurologically unresponsive.[6]

---

on the bed, (8) when his sister Nereyda came by looking for a
VCR, he and her entered the bedroom where Anthony was sleeping,
(9) as petitioner was disconnecting the VCR, Anthony woke up, sat
up, appeared to be attempting to vomit, and displayed obvious
difficulty breathing, (10) he carried Anthony to the living room
where he attempted to breath air into the child's mouth and
Nereyda placed alcohol on Anthony's head, (11) he then called 911
and asked that an ambulance be sent immediately, and (12) he
never struck Anthony in the head but gave his second statement to
police only after they pressured him to do so and told him what
to say. S.F. Trial, testimony of Armando Martinez, Volume 9 of
12, at p. 66-174; Volume 10 of 12, at pp. 39-126.
    The trial testimony of petitioner's sister Nereyda
corroborated those portions of petitioner's testimony reflecting
the steps they took when they jointly discovered Anthony
experiencing respiratory difficulties. S.F. Trial, testimony of
Nereyda Martinez, Volume 8 of 12, at pp. 228-46; Volume 9 of 12,
at pp. 6-61.

    [4] *Id.*

    [5] The lead paramedic who arrived at petitioner's mother's
apartment on January 17, 1999 testified (1) basic life support
had arrived by the time he and his partner made the scene, (2)
fire fighters had placed a mask on Anthony's mouth, (3) Anthony
was breathing only about once every ten-to-fifteen seconds, (4) a
bag was placed over Anthony's mouth to help him breath, (5)
Anthony was unconscious and gasping for air, (6) they were unable
to intubate the child and placed him on a backboard for transport
to the hospital, and (7) Anthony's pupils were dilated and
unresponsive. S.F. Trial, testimony of Mark S. Trevino, Volume 5
of 12, at pp. 29-63.

    [6] One of the emergency room physicians who treated Anthony
at BAMC testified during petitioner's trial that (1) Anthony was
neurologically unresponsive upon arrival, deeply comatose,
showing no spontaneous activity other than a heart beat, (2)

3

Late January 17, 1999, Anthony was transferred to the
pediatric intensive care unit at University Hospital, where he
was diagnosed with traumatic brain injury, found to be "totally
unresponsive to stimulation," and remained on a ventilator.[7]

---

Anthony was intubated and placed on a ventilator, (3) he
suspected significant head trauma or a toxin as the most likely
causes of Anthony's condition, (4) a CT scan showed fresh
collections of blood in both the subdural and subarachnoid
spaces, (5) it is rare to see blood in the subdural space absent
trauma, (6) a neurosurgical consult concluded the bleeding over
Anthony's brain was too vast and too likely to induce brain
swelling to permit surgical intervention, (7) clinical tests
showed indications of injury to Anthony's brain stem, (8) both
Anthony's eyes exhibited retinal hemorrhages, (9) no other
bleeding was observed in Anthony's body, (10) the decision was
made to transfer Anthony to University Hospital where a pediatric
intensive care unit was available, and (11) Anthony's injuries
were consistent with blunt force trauma to the head. S.F. Trial,
testimony of Dale Crockett, Volume 5 of 12, at pp. 69-121.

[7] One of the physicians who treated Anthony at University
Hospital testified at petitioner's trial that (1) Anthony arrived
at University Hospital late on January 17, 1999, comatose,
unstable, and totally unresponsive to any kind of stimulation,
(2) by five or six a.m. the following morning, Anthony's
condition had deteriorated, (3) Anthony's lung and heart
functions were bad and grew increasing worse, (4) Anthony had
brain swelling and bilateral retinal hemorrhages, (5) all those
problems were secondary to Anthony's brain injury, (6) Anthony
had several episodes of cardiac arrest in which he had to
resuscitated, (7) despite full efforts to resuscitate Anthony,
hospital staff were unable to restart his heart following the
final episode of cardiac arrest, (8) the autopsy results
indicated Anthony had suffered severe, lethal, traumatic brain
injury as a result of his having been subjected to a "violent
force" consistent with a head-on automobile collision resulting
in impact with a flat, broad surface, (9) this is not the type of
injury that can be inflicted on oneself by a three-year-old nor
is it consistent with an accidental injury occurring in normal
household activities, and (10) the back of Anthony's head was
struck with a flat broad surface or was struck against such a
surface. S.F. Trial, testimony of Thomas Mayes, Volume 8 of 12,
at pp. 10-89; Volume 10 of 12, at pp. 6-37.

Over the following twenty-four hours, Anthony's condition continued to deteriorate.[8]  Anthony experienced a series of cardiac episodes which necessitated him being resuscitated. Following the last such episode, hospital personnel were unable to re-start Anthony's heart.[9]  Anthony died at approximately 11:17 p.m. on January 18, 1999.[10]

An autopsy performed on Anthony on January 19, 1999 revealed Anthony (1) appeared healthy externally and displayed no indications of disease process in the internal examination of his organs, (2) experienced extensive bruising to the occipital (back area) of his scalp, (3) experienced substantial bleeding in both the subdural space between the skull and brain, as well as subarachnoid bleeding between the brain and the thin membrane covering the brain, (4) while no skull fracture was observed, swelling of the brain caused the sagittal suture of the top of Anthony's head to separate, (5) Anthony's brain injuries suggested an extremely violent impact between the back of his head and a broad, flat surface, and (6) the extensive nature of the injuries to Anthony's brain could not have been caused by an accidental fall from a bed but, instead, strongly suggested

_____

[8] *Id.*

[9] *Id.*

[10] *Id.*, Volume 8 of 12, at p. 28.

Anthony's head was violently swung against a hard, unyielding
surface.[11]

Petitioner subsequently gave police two written
statements.[12]  In his first statement, petitioner professed no
knowledge of how Anthony was injured but admitted no other person
had access to Anthony on the afternoon during which Anthony was
injured.[13]  In his second statement, petitioner admitted he
struck Anthony in the head with sufficient force to knock the
child off the bed and on to the bedroom floor.[14]

B.   The Indictments

On April 14, 1999, a Bexar County grand jury indicted
petitioner in cause no. 99-CR-1749 on a single Count of capital
murder, to wit, intentionally and knowingly causing the death of

---

[11] S.F. Trial, testimony of Vincent DiMaio, Volume 8 of 12,
at pp. 90-145.

[12] The San Antonio Police Detective who took petitioner's
first written statement testified he gave petitioner full Miranda
warnings and secured petitioner's signature on a warning rights
card before he obtained petitioner's first statement, which was
admitted into evidence at petitioner's trial as State Exhibit 15,
on the morning of January 18, 1999. S.F. Trial, testimony of
Louis Martinez, Volume 6 of 12, at pp. 70-173.
A different San Antonio Police Detective obtained
petitioner's second written statement, which was admitted into
evidence at petitioner's trial as State Exhibit 20, several hours
later. S.F. Trial, testimony of Henry Escobar, Volume 7 of 12, at
pp. 160-214.

[13] State Exhibit 15, found at S.F. Trial, Volume 12 of 12.

[14] State Exhibit 20, found at S.F. Trial, Volume 12 of 12.

Anthony Moczygemba, a child younger than six years, by striking Anthony with his hand.[15]

On June 29, 2000, a different Bexar County grand jury indicted petitioner in cause no. 2000-CR-3438 on a single Count of capital murder which alleged petitioner had knowingly caused the death of Anthony Moczygemba, a child younger than six years of age, by either striking Anthony with his hand, striking Anthony with an object unknown to the grand jury, striking Anthony against an object unknown to the grand jury, or by shaking Anthony.[16]

C.    Trial

Jury selection in petitioner's trial on the second indictment commenced on April 10, 2001.  The guilt-innocence portion of petitioner's trial commenced on April 12, 2001.  The testimony at trial is summarized above.

After deliberating less than four hours on April 23, 2001, petitioner's jury returned its verdict, finding petitioner guilty of capital murder as charged in the indictment.[17]  The trial

---

[15] Transcript of pleadings, motions, and other documents filed in petitioner's state criminal trial court proceeding, i.e., cause no. 2000-CR-3428, (henceforth "Trial Transcript"), at p. 162.

[16] Trial Transcript, at p. 2.

[17] The records from petitioner's trial indicate the jury began its deliberations at approximately 12:16 p.m. on April 23, 2001 and returned its verdict by not later than 4:03 p.m. the same date. Trial Transcript, at pp. 280-81; S.F. Trial, Volume 11

court immediately sentenced petitioner to serve a term of life imprisonment.[18]

D.   Direct Appeal

On June 25, 2002, petitioner filed a direct appeal from his conviction, challenging only the legal and factual sufficiency of the evidence supporting the jury's verdict.  In an unpublished opinion issued December 11, 2002, the Texas Fourth Court of Appeals affirmed petitioner's conviction. *Martinez v. State*, 04-01-00310-CR (Tex. App. -- San Antonio, December 11, 2002).

On February 10, 2003, petitioner filed a petition for discretionary review which the Texas Court of Criminal Appeals initially refused on April 30, 2003.[19]  On May 29, 2003, the Texas Court of Criminal Appeals finally refused petitioner's request for discretionary review.

E.   State Habeas Proceeding

On July 9, 2004, petitioner filed an application for state habeas corpus relief.[20]  In an Order issued August 24, 2004, the

---

of 12, at pp. 89-96.

[18] S.F. Trial, Volume 11 of 12, at pp. 96-97.

[19] Petitioner's petition for discretionary review raised only a single point, i.e., an argument that the Fourth Court of Appeals had employed the wrong legal standard in evaluating and rejecting petitioner's "factual insufficiency' point of error.

[20] Transcript of pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), at pp. 1-121.
As grounds for relief, petitioner's state habeas corpus

state trial court issued its findings of fact, conclusions of

law, and recommendation that petitioner's state habeas

application be denied.[21]  On October 13, 2004, the Texas Court of

Criminal Appeals denied petitioner's state habeas corpus

application without written order. *Ex parte Armando Martinez*,

App. No. 60,180-01 (Tex. Crim. App. October 13, 2004).

F.   Federal Habeas Proceeding

Not earlier than November 2, 2004, petitioner submitted a

*pro se* federal habeas corpus petition, signed October 29, 2004,

to responsible state prison officials for mailing to this

Court.[22]

_____

application asserted claims that (1) his constitutional rights
were violated as a result of the more than 19-month delay between
his arrest and trial, (2) the visiting judge who presided at his
trial was unqualified to do so, and (3) his trial counsel
rendered ineffective assistance by failing to (a) challenge the
delay in petitioner's indictment, (b) assert petitioner's right
to a speedy trial, ©) challenge the trial judge's qualifications,
(d) advance a defense based on the negligence of hospital
personnel in treating the victim's injuries, (e) advance a
defense based on the theory of "parental justification," and 9f)
request jury instructions on the defense of "parental
justification."

[21] State Habeas Transcript, at pp. 122-24.

[22] Docket entry no. 3.  While petitioner claims in several
of his more recent pleadings that he submitted his federal habeas
corpus petition and his accompanying application for leave to
proceed *in forma pauperis* to this Court on October 29, 2004, the
certified copy of petitioner's inmate trust account statement
attached to petitioner's IFP application is dated November 2,
2004.  Thus, it was not possible for petitioner to have submitted
his completed IFP application (including the attached inmate
trust account certificate) to responsible prison officials for
mailing to this court until at least November 2, 2004.

On April 12, 2005, respondent filed an answer in which he (1) argued petitioner's federal habeas corpus petition was untimely, (2) suggested petitioner's 'speedy trial" claim was unexhausted and, therefore, procedurally defaulted, and (3) failed to address the merits of any of petitioner's remaining claims for substantive relief.[23]  On April 14, 2005, respondent filed a supplemental answer, to which he attached a business records affidavit purportedly establishing that petitioner submitted his federal habeas corpus petition to state prison officials for mailing on November 3, 2004.[24]

On August 18, 2005, petitioner filed a response to respondent's answer in which he (1) asserted he had submitted his federal habeas corpus petition to state prison officials for mailing on October 29, 2005 and the state prison records attached to respondent's latest pleading were in error and (2) pointed out the majority of respondent's answer bore no relationship whatsoever to any of the claims in this cause.[25]

## II. AEDPA Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of

---

[23] Docket entry no. 12.  Curiously, respondent's answer includes more than twenty pages which address the wholly unrelated claims of a petitioner named "Livesay."

[24] Docket entry no. 13.

[25] Docket entry no. 16.

petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001).  Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).  Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A

11

state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'").  A state court's failure to cite governing Supreme Court authority does not, *per se* establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003).  A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535.  The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable"

12

application is different from a merely "incorrect" one. *Wiggins
v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *see Price v.
Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877
(2003)("it is the habeas applicant's burden to show that the
state court applied that case to the facts of his case in an
objectively unreasonable manner").  Legal principles are "clearly
established" for purposes of AEDPA review when the holdings, as
opposed to the dicta, of Supreme Court decisions as of the time
of the relevant state-court decision establish those principles.
*Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140,
2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal
principle or principles set forth by the Supreme Court at the
time the state court renders its decision.'"); *Lockyer v.
Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d
144 (2003).

The AEDPA also significantly restricts the scope of federal
habeas review of state court fact findings.  A petitioner
challenging state court factual findings must establish by clear
and convincing evidence that the state court's findings were
erroneous. See *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir.
2004)("The AEDPA requires that we presume correct the state
court's findings of fact unless the petitioner 'rebuts the
presumption of correctness by clear and convincing evidence.'"),
*cert. denied*, 543 U.S. 960 (2004); *Pondexter v. Dretke*, 346 F.3d

13

142, 146 & 149 (5th Cir. 2003)(holding, pursuant to §2254(e)(1), state court findings of fact are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence), *cert. denied*, 541 U.S. 1045 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003)(holding the same), *cert. denied*, 540 U.S. 1163 (2004); 28 U.S.C. § 2254(e)(1).

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. See *Pondexter v. Dretke*, 346 F.3d at 148 (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

14

### III. **Statute of Limitations Issue**

A.    Rules of General Applicability

On April 24, 1996, the President signed into law the
Antiterrorism and Effective Death Penalty Act of 1996
["AEDPA"],[26] which radically altered the standard of review by
this Court in federal habeas corpus proceedings filed by state
prisoners pursuant to Title 28 U.S.C. Section 2254.  The AEDPA
imposes a one-year limitations period on the filing of a federal
habeas corpus petition. *Pace v. DiGuglielmo*, 544 U.S. 408, 410,
125 S.Ct. 1807, 1809, 161 L.Ed.2d 669 (2005); *Emerson v. Johnson*,
243 F.3d 931, 932 (5th Cir. 2001); 28 U.S.C. §2244(d)(1).  Under
the AEDPA's one-year limitations provision, a convicted criminal
defendant must file a Section 2254 petition within one year of
the date his conviction becomes final generally or within one
year of the AEDPA's effective date, i.e., April 24, 1996, if the
defendant's conviction became final prior to that date. *Emerson
v. Johnson*, 243 F.3d at 932; *Ybanez v. Johnson*, 204 F.3d 645, 646
(5th Cir. 2000), *cert. denied*, 531 U.S. 881 (2000); *Felder v.
Johnson*, 204 F.3d 168, 169 (5th Cir. 2000), *cert. denied*, 531
U.S. 1035 (2000); *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir.
1999), *cert. denied*, 529 U.S. 1057 (2000); *Turner v. Johnson*, 177
F.3d 390, 391 (5th Cir. 1999), *cert. denied*, 528 U.S. 1007

---

[26] Pub.L. No. 104-132, 110 Stat. 1214 (1996).

(1999); *Fisher v. Johnson*, 174 F.3d 710, 712 (5th Cir. 1999),
*cert. denied*, 531 U.S. 1164 (2001); *Flanagan v. Johnson*, 154 F.3d
196, 199-201 (5th Cir. 1998).

The AEDPA's one-year limitations period serves the well-
recognized interest in the finality of state court judgments by
restricting the time a prospective federal habeas petitioner has
in which to seek federal habeas review. See *Rhines v. Weber*, 544
U.S. 269, 276-77, 125 S.Ct. 1528, 1534-35, 161 L.Ed.2d 440 (2005)
(recognizing that stay and abeyance is available in some cases as
a means of avoiding the harsh impact of the total exhaustion
requirement combined with the absence of any statutory tolling of
the AEDPA's limitations period arising from the filing of a
federal habeas petition that is subsequently dismissed for lack
of exhaustion); *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S.Ct.
1398, 1401, 155 L.Ed.2d 363 (2003)("Congress enacted the AEDPA to
reduce delays in the execution of state and federal criminal
sentences, particularly in capital cases, and 'to further the
principles of comity, finality, and federalism.'").

For the reasons set forth below, this Court concludes that
none of the petitioner's claims for federal habeas corpus relief
herein are barred by the AEDPA's one-year statute of limitations.

B.   Calculating the Applicable Limitations Period

Insofar as petitioner seeks relief pursuant to Title 28
U.S.C. Section 2254 in this Court, that effort is subject to the

16

one-year time limit provided for under Title 28 U.S.C. Section
2254(d) by the Anti-terrorism and Effective Death Penalty Act of
1996.  Under the AEDPA's one-year limitations provision, a
convicted criminal defendant must file a Section 2254 petition
within one year of the date his conviction becomes final
generally or within one year of the AEDPA's effective date, i.e.,
April 24, 1996, if the defendant's conviction became final prior
to that date. *Ybanez v. Johnson*, 204 F.3d at 646; *Felder v.
Johnson*, 204 F.3d at 169; *Coleman v. Johnson*, 184 F.3d at 401;
*Turner v. Johnson*, 177 F.3d at 391; *Fisher v. Johnson*, 174 F.3d
at 712; *Flanagan v. Johnson*, 154 F.3d at 199-201.

In this cause, the petitioner's April 23, 2001 conviction in
cause no. 2000-CR-3428 became final not later than ninety (90)
days after the date the Texas Court of Criminal Appeals *finally*
refused petitioner's petition for discretionary review, i.e., the
date that the petitioner's deadline for filing a petition for
certiorari with the United States Supreme Court expired. *See
Foreman v. Dretke*, 383 F.3d 336, 340 (5th Cir. 2004)(holding a
state prisoner's conviction became final ninety days after the
Texas Court of Criminal Appeals refused his petition for
discretionary review where the prisoner failed to file a timely
petition for writ of certiorari); *Roberts v. Cockrell*, 319 F.3d
at 694 (holding direct appeal terminates with the disposition of
a petition for writ of certiorari to the united States supreme

17

court or with the expiration of the deadline for filing such a petition).  Petitioner did not file a petition for certiorari. Thus, his state criminal conviction became final for purposes of the AEDPA's one-year statute of limitations when the time for filing a petition for writ of certiorari elapsed. *Roberts v. Cockrell*, 319 F.3d at 693-94; *Flanagan v. Johnson*, 154 F.3d at 197.

The Texas Court of Criminal Appeals initially refused petitioner's PDR on April 30, 2003.  However, that same state court issued a second Order on May 29, 2003 *finally* refusing petitioner's petition for discretionary review.  Respondent has offered no explanation for the entry of these dual Orders nor suggested any rational basis for disregarding the latter Order as the appropriate line of demarcation for determining the finality of petitioner's conviction.  Therefore, his conviction became "final" not later than August 28, 2003, i.e., the ninety-first day after the date the Texas Court of Criminal Appeals *finally* denied his petition for discretionary review.  Assuming Congress intended the AEDPA's one-year statute of limitations to be a 365-day limitations period, the statutory deadline for the filing of petitioner's *federal* habeas corpus petition was not later than August 27, 2004.[27]

_____

[27] Calendar year 2004 was a leap year, which included a February 29, 2004.  Nothing in the legislative history of the AEDPA suggests Congress intended to create a special 366-day

Petitioner filed his federal habeas corpus petition not earlier than November 2, 2004, i.e., the date included on the inmate trust account certificate appended to his application for leave to proceed *in forma pauperis*.  Thus, the one-year deadline for the filing of petitioner's *federal* habeas corpus petition expired long before petitioner ever filed his *federal* habeas corpus petition.

C.   Statutory Tolling Applies

Section 2244(d)(2) provides that the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation...." *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999), *cert. denied*, 529 U.S. 1099 (2000).  Petitioner argues the limitations period for his federal habeas corpus petition should have been tolled during the time period his state habeas corpus application was pending in the state courts.  For the reasons set forth below, when this period of statutory tolling is considered, petitioner's federal habeas corpus petition was timely filed.

---

statute of limitations for those petitioner's whose limitations periods happened to include portions of a leap year.  Thus, petitioner's one-year statute of limitations expired 365 after the date his state criminal conviction became final, i.e., the day after the 365th day following the expiration of the deadline for filing his petition for writ of certiorari with the united states supreme Court.

19

Petitioner's state habeas corpus application was filed on July 9, 2004.  As of that date, some 316 days had passed since petitioner's conviction became final on August 28, 2003.  Thus, forty-nine days of the AEDPA's one-year statute of limitations remained unexpired as of July 9, 2004.

The Texas Court of Criminal Appeals denied petitioner's state habeas corpus application on October 13, 2004.  Thus, the following date the period of statutory tolling ceased to apply and the remaining, unexpired, 49-day portion of the one-year statute of limitations commenced to run.  Even assuming the accuracy of respondent's assertion that petitioner did not submit his federal habeas petition to state prison officials for mailing to this Court until November 3, 2004, this date is well-within the 49-days remaining in petitioner's one-year limitations period.

Thus, when considered in view of the statutory tolling of the limitations period required by the AEDPA, petitioner's submission of his federal habeas corpus petition to state prison officials for mailing to this Court on November 3, 2004 renders petitioner's federal habeas petition timely.

D.    Equitable Tolling Also Applies

It is clear in this Circuit that a petitioner is entitled to equitable tolling of the AEDPA's one-year limitations period when the prisoner acts in reasonable reliance upon misinformation

communicated to him by the state or a federal habeas court or when the federal habeas court unwittingly hinders the petitioner's ability to pursue federal habeas relief. *Larry v. Dretke*, 361 F.3d 890, 897 (5th Cir. 2004); *Alexander v. Cockrell*, 294 F.3d 626, 629-30 (5th Cir. 2002); *United States v. Patterson*, 211 F.3d 927, 930-32 (5th Cir. 2000).  The Fifth Circuit has repeatedly held the fact a petitioner is proceeding *pro se* will not, standing alone, support equitable tolling. *Felder v. Johnson*, 204 F.3d at 170-71 (holding that neither the petitioner's pro se status, incarceration, claims of actual innocence, nor complaints of an inadequate prison law library warranted equitable tolling); *Turner v. Johnson*, 177 F.3d at 392 (recognizing that neither a petitioner's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits equitable tolling, regardless of whether the unfamiliarity is due to illiteracy of some other reason); *Fisher v. Johnson*, 174 F.3d at 714 (holding that neither ignorance of the law nor a prisoner's *pro se* status ordinarily excuses an untimely filing).  However, none of those opinions dealt with circumstances such as those in petitioner's case, in which the Texas Court of Criminal Appeals issued a confusing pair of orders almost a month apart both purportedly refusing that prisoner's petition for discretionary review.  The latter of those two orders was labeled "final" and was issued May 29, 2003.

21

Petitioner was entitled to rely upon the Texas Court of Criminal Appeals' issuance of this "final ruling" as the appropriate starting point for the ninety day period within which petitioner could file a petition for writ of certiorari with the United States Supreme Court.  Under the hopefully rare and exceptional circumstances of this case, this Court believes that petitioner is entitled to equitable tolling of the AEDPA's one-year statute of limitations sufficient to render his federal habeas corpus petition, filed not later than November 3, 2004, timely.

E.   Conclusion

For the reasons set above, this Court concludes respondent's motion to dismiss petitioner's federal habeas corpus petition as untimely is without merit.

### IV. Pre-Indictment Delay & Speedy Trial Claims

A.   State Court Disposition of the Claims

Liberally construing petitioner's *pro se* petition, in his first claim, petitioner argues his federal constitutional rights were violated by virtue of (1) the extensive pre-indictment delay between his arrest and indictment in cause 2000-CR-3428 and (2) the accompanying denial of his federal constitutional right to a speedy trial.  Petitioner fairly presented both these claims to the state courts in his brief accompanying his state habeas corpus application.[28]  The state habeas trial court addressed

---

[28] State Habeas Transcript, at pp. 23-26.

22

only the state law aspects of petitioner's initial group of claims for state habeas relief, finding them procedurally defaulted, but made no effort to address petitioner's *federal* constitutional complaints of prejudicial pre-indictment delay and denial of petitioner's constitutional right to a speedy trial.[29] In fact, the state habeas trial court failed to even mention the existence of petitioner's *federal* constitutional claims in its cursory Order recommending rejection of petitioner's state habeas corpus application.

B.   Standard of Review

Thus, the Texas Court of Criminal Appeals' subsequent summary rejection of petitioner's state habeas corpus application cannot be construed as a rejection *on the merits*, for AEDPA purposes, of petitioner's first pair of federal constitutional claims.  Under such circumstances, i.e., where the state courts failed to adjudicate the merits of a federal constitutional claim, this Court's review of the un-adjudicated claim is *de novo*. See Rompilla v. Beard, 545 U.S. 374, ___, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

_____

[29] State Habeas Transcript, at pp. 123-24.

C.   Pre-Indictment Delay Claim

In this Circuit, a complaint of improper pre-indictment delay requires a showing that both (1) the delay was intentionally brought about by the prosecution for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other bad faith purpose and (2) the improper delay caused actual substantial prejudice to the defense. *United States v. Avants*, 367 F.3d 433, 441 (5th Cir. 2004); *United States v. Crouch*, 84 F.3d 1497, 1523 (5th Cir. 1996), *cert. denied*, 519 U.S. 1076 (1997).  Prejudice may not be presumed from the length of the delay. *United States v. Crouch*, 84 F.3d at 1523.  "Actual, substantial prejudice" means more than vague assertions of lost witnesses, faded memories, or misplaced documents. *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir. 1997), *cert. denied*, 522 U.S. 848 (1997); *United States v. Beszborn*, 21 F.3d 62, 67 (5th Cir. 1994), *cert. denied*, 513 U.S. 934 (1994).

In neither his pleadings in this Court nor his pleadings in his state habeas corpus proceeding has petitioner alleged any specific facts showing either (1) the delay between his January, 1999 arrest and his June, 2000 re-indictment was intentionally brought about by the prosecution for the purpose of obtaining some tactical advantage against petitioner or for any other bad faith purpose nor (2) petitioner sustained any actual,

24

substantial, prejudice as a result of this delay.  In point of fact, petitioner was initially indicted for capital murder in connection with the death of Anthony Moczygemba on April 14, 1999, less than three months after petitioner's arrest.  The only differences between the initial indictment against petitioner and the one under which petitioner was actually tried consisted of additional theories of precisely how petitioner inflicted the fatal injuries on Anthony.  Petitioner has not alleged any facts showing the prosecution deliberately or intentionally delayed re-indicting petitioner for the purpose of gaining some tactical advantage at trial or for any other illicit purpose.  Nor has petitioner alleged any specific facts establishing precisely how he was prejudiced by virtue of the delay between his arrest and re-indictment.  Under such circumstances, petitioner's complaint of pre-indictment delay fails to raise even an arguable basis for a finding of a due process violation and does not warrant federal habeas corpus relief.

D.   Speedy Trial Claim

    1.   The Constitutional Standard

    The Sixth Amendment's guarantee that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial is made applicable to the states through the Fourteenth Amendment. *Smith v. Hooey*, 393 U.S. 374, 374-75, 89 S.Ct. 575, 575, 21 L.Ed.2d 607 (1969); *Cowart v. Hargett*, 16 F.3d

642, 645 (5th Cir. 1994), *cert. denied*, 513 U.S. 886 (1994).   The
Supreme Court announced the criteria to be applied to federal
constitutional speedy trial claims in *Barker v. Wingo*, 407 U.S.
514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).   Those factors are (1)
the length of the delay; (2) the reasons for the delay; (3) the
defendant's assertion of his right; and (4) prejudice to the
defendant. *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct.
2686, 2690, 120 L.Ed.2d 520 (1992); *Barker v. Wingo*, 407 U.S. at
530-32; 92 S.Ct. at 2192-93; *United States v. Frye*, 372 F.3d 729,
735 (5th Cir. 2004), *cert. denied*, 543 U.S. 1155 (2005); *United
States v. Serna-Villarreal*, 352 F.3d 225, 230 (5th Cir. 2003),
*cert. denied*, 541 U.S. 981 (2004); *United States v. Bieganowski*,
313 F.3d 264, 284 (5th Cir. 2002), *cert. denied*, 538 U.S. 1014
(2003); *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000), *cert.
denied*, 532 U.S. 975 (2001).   Once triggered by arrest,
indictment, or mother official accusation, the speedy trial
inquiry must weigh the effect of delay on the accused's defense
just as it has to weigh any other form of prejudice recognized in
*Barker*. *Doggett v. United States*, 505 U.S. at 655, 112 S.Ct. at
2692.

    2.   <u>Length of the Delay</u>

When evaluating delay, courts must consider the complexity
and of each case. *See Barker v. Wingo*, 407 U.S. at 530-31, 92
S.Ct. at 2192 ("the delay that can be tolerated for an ordinary

street crime is considerably less than for a serious, complex conspiracy charge"); *United States v. Frye*, 372 F.3d at 737-38 (recognizing the same principle); *United States v. Bieganowski*, 313 F.3d at 284 (recognizing the same).

The length of the delay is a triggering mechanism; until the defendant can show the interval between accusation and trial crosses the threshold dividing ordinary pretrial delay from "presumptively prejudicial" delay, there is no necessity for inquiry into the remaining factors. *Doggett v. United States*, 505 U.S. at 651-52, 112 S.Ct. at 2690-91; *Barker v. Wingo*, 407 U.S. at 530-31, 92 S.Ct. at 2192; *United States v. Frye*, 372 F.3d at 736; *United States v. Serna-Villarreal*, 352 F.3d at 230; *Knox v. Johnson*, 224 F.3d at 477.

The delay of approximately 26 months between petitioner's January, 1999 arrest and the start of his April, 2001 trial is sufficient in duration to satisfy the requirement of a "presumptively prejudicial" delay. *See Doggett v. United States*, 505 U.S. at 652 n.1, 112 S.Ct. at 2691 n.1 (noting most lower federal courts have generally tended to find delay "presumptively prejudicial" as the delay approached one-year); *United States v. Frye*, 372 F.3d at 736-37 (applying this Circuit's one-year "rule of thumb" standard and holding a 17-month delay sufficient to warrant consideration and weighing of the remaining *Barker* factors); *United States v. Serna-Villarreal*, 352 F.3d at 230

(applying the same one-year standard to the "presumptively prejudicial" delay determination).

    3.   <u>Reason for the Delay</u>

    Different weights are assigned to different reasons for delay. *See Doggett v. United States*, 505 U.S. at 657, 112 S.Ct. at 2693 ("the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness and its consequent threat to the fairness of the accused's trial"); *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192 ("A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally a valid reason, such as a missing witness, should serve to justify appropriate delay."); *United States v. Frye*, 372 F.3d at 738 ("While a delay to permit the Government further to investigate the case is likely to harm a defendant..., reasonable investigative delay is not the kind of delay with which the *Barker* Court was concerned."); *United States v. Serna-Villarreal*, 352 F.3d at 232 (recognizing that situations in which the prosecution acted diligently and in bad faith represent the

28

extremes and that the more common cause of delay, i.e., official negligence, increases in significance as a factor as the length of the delay increases).

Petitioner has alleged no specific facts suggesting any of the delay between his arrest and the commencement of his trial resulted from any intentional act on the part of the prosecution, was designed to gain the prosecution an advantage over the defendant at petitioner's trial, or was the product any other illicit motive.  The case against petitioner was technically complex and largely circumstantial.  There were no eyewitnesses to the offense.  There was no obvious murder weapon.  The theory of capital murder supporting the charge against petitioner was premised on the opinions of a variety of medical professionals which were substantiated by numerous medical records subject to competing interpretation by reasonable professionals. Prosecutors originally charged petitioner with having fatally struck Anthony but later dismissed that theory and offered a series of alternative theories, including not only the infliction of a blow to the head but also the application of force causing Anthony's head to strike a flat surface or object unknown to the grand jury.  Any finding of official negligence resulting in the delay between petitioner's arrest and trial must necessarily take into consideration these facts.

29

4.   <u>Defendant's Assertion of the Right</u>

The Supreme Court has expressly rejected the suggestion that a criminal defendant who fails to specifically assert his speedy trial right waives same. *Barker v. Wingo*, 407 U.S. at 538, 92 S.Ct. at 2191.  Still, the timeliness of the defendant's assertion of his speedy trial right is entitled to strong evidentiary weight in determining whether the defendant was deprived of that right. *See Doggett v. United States*, 505 U.S. at 656, 112 S.Ct. at 2693 (recognizing that pretrial delay is often both inevitable and wholly justifiable); *Barker v. Wingo*, 407 U.S. at 531-32, 92 S.Ct. at 2192-93 (the failure to assert the right will make it difficult for a defendant to prove he was denied a speedy trial); *United States v. Frye*, 372 F.3d at 739 (recognizing that when and how a request for a speedy trial is made to the trial court is critical and that am assertion that charges be dismissed for a speedy trial violation does not assert the concern addressed in *Barker*).

Petitioner identifies no specific action he undertook to request or compel the state trial court to commence his trial in a more expeditious manner.  This Court's independent review of the state trial court record discloses no motion or other pleading filed by the defense addressing the timeliness of petitioner's trial until February 2, 2001, some two months before

petitioner's trial actually commenced, in which petitioner sought dismissal of the charge against him.[30]

5.   Prejudice

The Supreme Court has emphasized three interests should be considered in determining whether a defendant has been prejudiced by pretrial delay: (1) the desire to avoid oppressive pretrial incarceration; (2) the desire to reduce anxiety and concern of the accused; and (3) the possibility that the accused's defense will be impaired by dimming memories and the loss of exculpatory evidence. *Doggett v. United States*, 505 U.S. at 654, 112 S.Ct. at 2692; *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193; *United States v. Frye*, 372 F.3d at 739-40; *United States v. Serna-Villarreal*, 352 F.3d at 231 n.3.

Truly significant delays in bringing a defendant to trial can obviate the necessity for a showing of particularized prejudice. *Doggett v. United States*, 505 U.S. at 654-57, 112 S.Ct. at 2692-93; *United States v. Frye*, 372 F.3d at 737-39. However, absent a truly extended period of delay, the defendant must make a particularized showing that he has suffered prejudice in order to prevail on his speedy trial claim. *Doggett v. United States*, 505 U.S. at 654-58, 112 S.Ct. at 2692-94; *United States v. Frye*, 372 F.3d at 737-40.  The fact that a delay may be sufficiently long to trigger review of the remaining *Barker*

---

[30] Trial Transcript, at pp. 208-11.

factors does *not* itself establish that the defendant has satisfied the final *Barker* prejudice factor. *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993), *cert. denied*, 510 U.S. 1167 (1994).  The length of the delay in bringing petitioner to trial was sufficient to trigger analysis of the remaining *Barker* factors but not so lengthy as to eliminate the need for petitioner to make a particularized showing of prejudice under the final *Barker* factor. *See United States v. Frye*, 372 F.3d at 737 (recognizing federal courts have generally applied a presumption of prejudice only when pretrial delay exceeded five years); *United States v. Serna-Villarreal*, 352 F.3d at 232 (recognizing the same).

    6.   <u>Conclusions</u>

The absence of dilatory tactics by the prosecution militates against a finding of prejudice under the final prong of the *Barker* test. *See United States v. Frye*, 372 F.3d at 739-41 (the prosecution's continuing its preparation during the delay does not constitute prejudice); *United States v. Serna-Villarreal*, 352 F.3d at 233 (delay of three years did not warrant a finding of prejudice absent a showing the delay adversely affected the evidence so as to undermine the fairness of the trial); *United States v. Bieganowski*, 313 F.3d at 284-85 (claims of psychological and economic strain are insufficient to establish prejudice).  Conclusory allegations of prejudice are insufficient

to establish prejudice under *Barker* and its progeny. *Nelson v. Hargett*, 989 F.2d 847, 853 (5th Cir. 1993); *United States v. Juarez-Fierro*, 935 F.2d 672, 676 (5th Cir. 1991), cert. denied, 502 U.S. 951 (1991).

The last form of prejudice, i.e., impairment of the defendant's ability to defend himself at trial, is the most serious because the inability of the defendant to adequately prepare his case skews the fairness of the entire criminal justice system. *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193. Petitioner presented this Court with no specific factual allegations showing that he suffered any impairment to his ability to prepare his case or to defend himself at trial resulting from the delay in bringing him to trial. Petitioner has failed to allege any specific facts showing he sustained any actual prejudice as a result of, or during, the 27-month delay between his arrest and trial. He has not identified any tactical advantage the prosecution gained by virtue of this delay. Nor has he alleged any facts showing the delay was the product of any intentional acts by prosecutors. Petitioner has not identified any evidence which became unavailable during the delay between his arrest and the start of his trial. Likewise, petitioner has identified no witnesses whose ability to give testimony favorable to petitioner was diminished by the passage of time between January, 1999 and April, 2001.

33

Under the record before this Court, the weight of the four Barker factors does *not* favor petitioner.  The reasons for the delay in bringing petitioner to trial are not apparent from the record.  Other than the length of the delay itself and the fact that petitioner was in custodial detention from January, 1999 through April, 2001, petitioner has made no particularized showing that he has suffered any prejudice resulting from the delay.  Under the record currently in this cause, this Court concludes petitioner has failed to establish that federal constitutional right to a speedy trial was violated by the delay in bringing him to trial.

### V.  "Unqualified" Trial Judge Claim

A.   State Court Disposition of the Claim

In his second claim, petitioner argues the state trial judge who presided over petitioner's trial was unqualified to do so under applicable state law.  The state habeas court concluded *retired* former state appellate judge Bill White was fully qualified to preside at petitioner's trial and rejected petitioner's arguments to the contrary as "wholly without merit."[31]

B.   No Federal Habeas Relief Based on State-Law Complaints

The fundamental problem with petitioner's second claim for relief herein is that it fails to assert a violation of

_____

[31] State Habeas Transcript, at p. 123.

petitioner's *federal* constitutional rights.  Determining the qualifications of state trial judges are generally matters left to the States.  Nothing in the United States Constitution mandates any particular set of qualifications for state judicial officers.

A state prisoner seeking federal court review of his conviction pursuant to Title 28 U.S.C. Section 2254 must assert a violation of a federal constitutional right. *Lawrence v. Lensing*, 42 F.3d 255, 258 (5th Cir. 1994); Gray v. Lynn, 6 F.3d 265, 268 (5th Cir. 1993); *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993).  Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984); *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997), *cert. denied sub nom. Johnson v. Monroe*, 522 U.S. 1003 (1997); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242 (1997); *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993), *cert. denied*, 510 U.S. 1025 (1993); *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir. 1988); *Rault v. Butler*, 826 F.2d 299,

35

302 n.1 (5th Cir. 1987), *cert. denied*, 483 U.S. 1042 (1987); *Neyland v. Blackburn*, 785 F.2d 1283, 1293 (5th Cir. 1986), *cert. denied*, 479 U.S. 930 (1986).

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does <u>not</u> sit as a super-state appellate court. *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991), *cert. denied*, 502 U.S. 875 (1991). "[F]ederal courts do not sit as courts of appeal and error for state court convictions." *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986); *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988). This Court does *not* review a state prisoner's federal habeas corpus petition to determine whether the state appellate courts correctly construed and applied state law. Federal habeas corpus relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. at 67-68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874; *Pemberton v. Collins*, 991 F.2d at 1223; *Lavernia v. Lynaugh*, 845 F.2d at 496; *Rault v. Butler*, 826 F.2d at 302 n.1; *Neyland v. Blackburn*, 785 F.2d at 1293. The question before a federal habeas corpus court is *not* whether the state court correctly applied its own interpretation of state law; rather, the question is whether the petitioner's *federal* constitutional rights were violated. *Neyland v. Blackburn*, 785 F.2d at 1289.

> When a federal district court reviews a state
> prisoner's habeas petition pursuant to 28 U.S.C. § 2254
> it must decide whether the petitioner is "in custody in
> violation of the Constitution or laws or treaties of
> the United States."  The court does not review a
> judgment, but the lawfulness of the petitioner's
> custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115

L.Ed.2d 640 (1991).  Thus, the issue before this Court is *not*

whether the Texas courts properly applied state-law principles

when addressing the trial judge's qualifications but whether

petitioner's *federal* constitutional rights have been violated *in

this case*.  Insofar as petitioner argues that his state statutory

or state constitutional rights were violated, independently of

any federal constitutional violation, his arguments do not

furnish even an arguable basis for *federal* habeas corpus relief.

Petitioner has failed to identify any specific provision of

the united states constitution he claims was violated by virtue

of the service of a retired state appellate jurists as his trial

judge.  The States remain free to manage their judicial systems

and to set qualifications for their judicial officers as they see

fit.  Nothing in the federal Constitution requires state judicial

officers to be licensed attorneys or to possess any other

specific set of experience and qualifications.  Nor does the

federal Constitution prescribe any particular form of oath which

must be administered to state judicial officers before they may

perform state judicial duties.  Petitioner's second claim fails

to state even an arguable basis for federal habeas corpus relief.

### VI. **Ineffective Assistance Claims**

A.   <u>State Court Disposition of the Claims</u>

As he argued in his state habeas corpus proceeding,

petitioner complains in his third ground for federal habeas

corpus relief herein that his trial counsel rendered ineffective

assistance by failing to (1) object to, or file a pretrial motion

to quash, the second indictment against petitioner as untimely,

(2) object to the delay in petitioner's prosecution, (3) object

to, or otherwise move to challenge, the purported lack of

qualifications possessed by the state trial judge, (4) file

motions to suppress petitioner's statements, (5) advance a

defense premised on the theory that hospital negligence actually

caused the victim's death, (6) advance a defense premised on the

theory of "parental justification," or (7) request a jury

instruction on "parental justification."  The state habeas trial

court concluded petitioner's complaints about his trial counsel's

failures to challenge either the timeliness of the second

indictment against petitioner or the trial judge's qualifications

did not deprive petitioner of effective assistance of counsel

under the Sixth Amendment.[32]

---

[32] State Habeas Transcript, at p. 123.

B.   Federal Constitutional Standard

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000).  In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make

every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).   It is strongly presumed  counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542;  *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*  In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is

whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004).  In making this determination, this Court must consider the underlying *Strickland* standard. *Id*.  In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, ___, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

Applying the AEDPA's standard of review, the issue before this Court is whether the Texas Court of Criminal Appeals could *reasonably* have concluded that petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d at 444.  In making this determination, this Court must consider the underlying *Strickland* standard. *Id*.

41

C.    <u>Failure to Challenge Indictment or Object to Pretrial Delay</u>

Insofar as petitioner complains that his trial counsel failed to challenge his indictment in cause no. 2000-CR-3428 as untimely under state law, that complaint is without any arguable merit.  The state habeas trial court concluded petitioner was indicted in a timely manner in cause no. 99-CR-1749 and that the state statute which formed the basis for petitioner's claim of untimeliness did not apply to petitioner's subsequent re-indictment.[33]  Petitioner has called to this Court's attention no state legal authorities contradicting either of these two determinations of state law.

Insofar as petitioner complains his trial counsel failed to file a motion raising a speedy trial challenge, that contention is factually inaccurate.  On February 2, 2001, petitioner's trial counsel filed a motion to dismiss the indictment against petitioner on speedy trial grounds.[34]

Insofar as petitioner complains that his trial counsel failed to do more to raise a speedy trial complaint or otherwise object to allegedly improper pre-indictment delay in petitioner's case, for the reasons set forth at length above in Section IV, neither of those contentions have any arguable merit.

---

[33] State Habeas Transcript, at pp. 123-24.

[34] Trial Transcript, at pp. 208-11.

42

There was nothing "objectively unreasonable" with the failure of petitioner's trial counsel to raise what would clearly have been meritless, if not frivolous, speedy trial objections and equally unavailing state-law challenges to the timeliness of his indictment.  Likewise, petitioner was not "prejudiced" within the meaning of *Strickland* by the failure of his trial counsel to raise these meritless contentions.  For those reasons, petitioner's first two assertions of ineffective assistance each fail to satisfy either prong of the *Strickland* test.

D.   Failure to Challenge Trial Judge's Qualifications

Contrary to the contention underlying this aspect of petitioner's ineffective assistance claim, petitioner's trial counsel did file a motion objecting to the referral of petitioner's case to a visiting judge.[35]  A hearing was held on this motion on April 6, 2001.  Petitioner does not allege any specific facts showing there was any additional evidence or legal authority available as of the date of that hearing which his trial counsel could have presented to the state trial court.

This Court has independently reviewed all of the statutory, state constitutional, and case law authorities cited by petitioner, as conducted independent research for additional authorities, and has been unable to identify any legal authority providing a retired former member of the Texas Court of Criminal

---

[35] Trial Transcript, at pp. 233-36.

43

Appeals is unqualified under state law to serve as a trial judge in a felony criminal proceeding. Simply put, there is nothing in applicable Texas law which precluded Bill White from serving as petitioner's trial judge. As explained in Section V above, nothing in any applicable federal law purports to establish the qualifications for state trial judges.

The failure of petitioner's trial counsel to challenge the qualifications of former Texas Court of Criminal Appeals judge Bill White to serve as petitioner's trial judge was, therefore, neither objectively unreasonable nor "prejudicial" to petitioner within the meaning of *Strickland*.

E. <u>Failure to Move to Suppress Petitioner's Statements</u>

Petitioner's trial counsel did a file motion to suppress petitioner's statements.[36] A two-day evidentiary hearing was held on petitioner's suppression motion on March 28-29, 2000 while the cause was still under case number 99-CR-1749. At the conclusion of that hearing, the state trial court denied petitioner's motion to suppress. Thus, insofar as petitioner alleges his trial counsel failed to file and prosecute a motion to suppress petitioner's statements to police, petitioner's claim is factually frivolous.

Furthermore, petitioner does not identify any additional evidence or legal authority available as of the date of that

---

[36] Trial Transcript, at pp. 25-28.

hearing which his trial counsel could have furnished to the trial court.

Under such circumstances, the performance of petitioner's trial counsel vis-a-vis petitioner's written statements was neither objectively unreasonable nor "prejudicial" to petitioner within the meaning of *Strickland*.

F.   Failure to Advance a "Hospital Negligence" Defense

Insofar as petitioner complains that his trial counsel failed to develop and present evidence supporting a defensive theory suggesting Anthony's death resulted from negligence on the part of hospital personnel, more specifically from the allegedly negligent administration of epinephrine to Anthony, the fundamental problem is that petitioner has alleged no specific facts establishing that Anthony's death resulted in any part from the administration of epinephrine, also known as adrenalin, to Anthony after Anthony arrived at the hospital.  More specifically, petitioner alleges no specific facts showing that Anthony's extensive intra-cranial bleeding resulted from, or was caused by, the administration of epinephrine following Anthony's admission to BAMC, rather than from the traumatic brain injury evidenced by Anthony's condition as observed by paramedics when they arrived at petitioner's mother's apartment on January 17, 1999.  On the contrary, the trial testimony of petitioner, petitioner's sister Nereyda, and the emergency medical technician

who examined Anthony prior to Anthony's transport to BAMC were all consistent that Anthony was exhibiting classic symptoms of traumatic brain injury prior to Anthony's arrival at BAMC.[37]

To summarize the expert testimony given during petitioner's capital murder trial, Anthony died as a result of traumatic brain injury, most likely caused by Anthony's head having been hurled or swung into a broad, flat, unyielding surface with sufficient force to cause bruising to the back of Anthony's head beneath the scalp, extensive hemorrhaging in both the subdural and subarachnoid spaces, and bilateral retinal hemorrhaging, along with sufficient injury to the brain stem to render Anthony "deeply comatose," i.e., devoid of any spontaneous neurological activity other than a heart beat, *upon his admission to BAMC*.[38]

----

[37] *See* S.F. Trial, testimony of Mark S. Trevino, Volume 5 of 12, at pp. 29-63 (Anthony's pupils were dilated and unreactive, Anthony was not breathing properly, was gasping, and unconscious upon Trevino's arrival at the apartment); testimony of Nereyda Martinez, Volume 8 of 12, at pp. 234-35, and Volume 9 of 12, at pp. 40-42 (it was apparent when she returned to the apartment the second time that afternoon that Anthony was in serious trouble, was having difficulty breathing, and was unresponsive to the touch or smell of the alcohol she placed on the child's body); and testimony of Armando Martinez, Volume 9 of 12, at pp. 83-85 (it was apparent Anthony was having difficulty breathing, appeared to be trying to vomit or choking, and was not responsive to the alcohol placed on his body).

[38] S.F. Trial, testimony of Dr. Dale Crockett, Volume 5 of 12, at pp. 71-97.  Dr. Crockett testified, without contradiction at petitioner's trial, that Anthony presented at BAMC as essentially "brain dead." *Id.*, at p. 97.

There was no dispute at petitioner's trial that Anthony's
fatal brain injury occurred prior to Anthony's arrival at BAMC.
Petitioner offers no rational explanation as to how any
administration of epinephrine subsequent to Anthony's arrival at
BAMC on January 17, 1999 constituted a superseding cause of
Anthony's eventual death on January 18, 1999 from cardiac arrest.
As Dr. Mayes explained in his lengthy testimony during
petitioner's trial testimony, the extensive nature of Anthony's
traumatic brain injury resulted in bleeding on the surface of the
brain and an irreversible deterioration of Anthony's heart and
lung function which eventually culminated in cardiac arrest.[39]

Petitioner offers no fact-specific explanation as to how the
administration of epinephrine to Anthony following Anthony's
arrival at BAMC caused Anthony any harm above and beyond that
already inflicted by Anthony's fatal brain injury.  Nor does
petitioner explain why the administration of epinephrine by
hospital staff was contra-indicated for a patient suffering from
progressive deterioration of heart and lung function.  Under such
circumstances, petitioner's naked assertion that Anthony died,
not from his extensive traumatic brain injury but, rather, from

_____

[39] S.F. Trial, testimony of Dr. Thomas Mayes, Volume 8 of
12, at pp. 20-102; Volume 10 of 12, at pp. 6-37.  Dr. Mayes
explained that it was apparent to him the first time he saw
Anthony that the child was going to die. *Id.*, Volume 8 of 12, at
p. 75.

an improper administration of epinephrine finds no support in the record or in tangible reality.

The failure to petitioner's trial counsel to assert a defense based on the unsubstantiated theory that Anthony's death was caused by the allegedly improper administration of epinephrine neither caused the performance of said counsel to fall below an objective level of reasonableness nor "prejudiced" petitioner within the meaning of *Strickland*.

G.   Failure to Present and Request a Jury Instruction on the Defense of "Parental Justification"

In his final two assertions of ineffective assistance, petitioner contends his attorney should have asserted a defense, and requested a jury instruction premised on, the theory of "parental justification."  For various reasons, the strategic decision by petitioner's trial counsel not to present a "parental justification" defense was both objectively reasonable and non-prejudicial within the meaning of *Strickland*.

Texas law recognizes the availability of a defense of "parental justification" to a charge of injury to a child only when the force employed (1) was not deadly force, (2) was employed by the child's parent or a person acting in loco parentis, and (3) the actor reasonably believes the degree of force employed was necessary to discipline the child or to safeguard or promote the child's welfare. *Assiter v. State*, 58 S.W.3d 743, 748 (Tex. App. -- Amarillo 2000); *Goulart v. State*,

26 S.W.3d 5, 10 (Tex. App. -- Waco 2000, *pet. ref'd)*; Texas Penal Code § *9.61(a)*.  There are several reasons why Section 9.61(a)'s "parental justification" theory was legally u8navailable to petitioner.  First, because the force applied against Anthony was clearly deadly in nature, Section 9.61(a)'s provisions, by their express terms, did not apply to the charge against petitioner. Second, petitioner has alleged no specific facts showing that he was Anthony's parent or acting in loco parentis; at best, petitioner's trial testimony established he was baby-sitting Anthony on the afternoon of the fatal incident.  Finally, petitioner has alleged no facts showing the fatal injuries inflicted on Anthony were an objectively reasonable response by petitioner to any misbehavior on Anthony's part.

More significantly, at trial, petitioner's counsel presented testimony and argued that petitioner had not struck Anthony in the head and the fatal injuries sustained by Anthony were the result of an accident or some unknown cause.  Given the severity of Anthony's injuries, it would have been extremely difficult for petitioner's trial counsel to have asserted a defensive theory premised on the contention that petitioner was *reasonably* disciplining Anthony at the time those fatal injuries were inflicted.  Furthermore, because Anthony's injuries were fatal, by its own terms, the statutory defense was unavailable to petitioner.

Under such circumstances, the failure of petitioner's trial counsel to assert and seek jury instructions on, the defensive theory of "parental justification," was neither objectively unreasonable nor "prejudicial" to petitioner within the meaning of *Strickland*.

H.   Conclusions

None of petitioner's assertions of ineffective assistance satisfy either prong of *Strickland*.   Therefore, the state habeas court's denial on the merits of petitioner's multi-faceted ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceeding.

## VII. Certificate of Appealability

The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a Certificate of Appealability ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for

a CPC).  The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2).  Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000)(holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).  In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz*

51

*v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is authorized to address the propriety of granting a CoA *sua sponte*. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's